IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LISA C., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 7:18-cv-269** |
| ) | |
| **ANDREW SAUL,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Lisa C. ("Lisa") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Lisa alleges that the Administrative Law Judge ("ALJ") erred because substantial evidence does not support: (1) her evaluation of the opinion of Lisa's treating physician; (2) her physical RFC findings; and (3) her assessment of Lisa's subjective allegations of impairment. I conclude that the ALJ failed to adequately explain the basis for her evaluation of Lisa's treating physician's opinion. Accordingly, I **RECOMMEND GRANTING in part** Lisa's Motion for Summary Judgment (Dkt. No. 19) and **RECOMMEND DENYING** the Commissioner's Motion for Summary Judgment (Dkt. No. 13).

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Lisa failed to demonstrate that she was disabled

1

under the Act.[1] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d 176, 188 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted). In Mascio and Monroe, the Court of Appeals remanded because the ALJ failed to adequately explain how he arrived at conclusions regarding the claimant's RFC. Mascio, 780 F.3d at 636; Monroe, 826 F.3d at 189. Similarly, I find that remand is appropriate here because the ALJ's opinion leaves the Court to guess at how she reached her conclusions regarding the opinion of Lisa's treating physician.

## CLAIM HISTORY

Lisa filed for DIB on November 18, 2013, claiming disability due to pain in her back and

---

[1] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

legs, anxiety, depression, fibroid tumors, pain from her neck to buttocks, left knee pain, status post left ankle fracture with pain and swelling, weakness in her left ankle, pain in her arms and hands, pre-diabetes, and difficulty leaving the safety of her home, with an alleged onset date of January 2, 2013. R. 518–19. Lisa was 45 years old when she applied for DIB, making her 44 years old on her alleged onset date. R. 518. Lisa's date last insured was December 31, 2017; thus, she must show that her disability began on or before December 31, 2017, and existed for twelve continuous months, to receive DIB. R. 13; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Lisa's application at the initial and reconsideration levels of administrative review. R. 518–41. On March 28, 2017, ALJ Geraldine H. Page held a hearing to consider Lisa's claim for DIB. R. 486–517. Counsel represented Lisa at the hearing, which included testimony from vocational expert Barry Hensley. R. 486. On May 31, 2017, the ALJ entered her decision analyzing Lisa's claims under the familiar five-step process[2] and denying her claim for benefits. R. 11–23.

The ALJ found that Lisa had not engaged in substantial gainful activity since January 2, 2013, the alleged onset date. R. 13. The ALJ determined that Lisa suffered from the severe impairments of diabetes mellitus, fibromyalgia, degenerative joint disease of the right elbow and left shoulder, osteoarthritis of the left knee, and status post left ankle fracture. Id. The ALJ found that Lisa's myopia, astigmatism, presbyopia, fibroid tumors, dermatitis and allergic rhinitis, hypertension, GERD, vitamin D deficiency, Raynaud's, and heart blockage were either not

---

[2] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

severe or not medically determinable because they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a severe level for a continuous period of twelve months, are not expected to result in death, or have not been properly diagnosed by an acceptable medical source. R. 13–14. The ALJ determined that Lisa's impairments, either individually or in combination, did not meet or medically equal a listed impairment, specifically considering listing 1.02 (major dysfunction of a joint), the relevant listings for diabetes mellitus, and the regulations governing consideration of fibromyalgia and obesity. R. 14–15. The ALJ did not find that Lisa had a mental impairment.

The ALJ concluded that Lisa retained the residual functional capacity ("RFC") to perform light work with certain limitations. R. 15. Lisa can lift and carry no more than twenty pounds occasionally and ten pounds frequently, stand and walk for no more than two to four hours in an eight-hour workday, and sit for no more than six hours in an eight-hour workday. Id. Lisa's postural limitations include frequent overhead reaching; occasionally climbing ramps and stairs, balancing, kneeling, stooping, and crouching; and never crawling. Id. For environmental limitations, the ALJ found that Lisa should avoid concentrated exposure to extreme temperatures, excess humidity, and pulmonary irritants. Id. She should also avoid all exposure to hazardous machinery, working at unprotected heights, working on vibrating surfaces, and climbing ladders, ropes, or scaffolds. Id. The ALJ found that Lisa is unable to perform her past work as a cashier, assistant manager/manager, stocker, self-employed cosmetic salesperson, or optic technician/polisher. R. 21. The ALJ determined that Lisa could still perform jobs that exist in significant numbers in the national economy, such as office helper, nonpostal mail clerk, and order clerk. R. 22. The ALJ ultimately concluded that Lisa was not disabled. R. 23. The Appeals Council denied Lisa's request for review on April 21, 2018. R. 1–7.

## ANALYSIS

Lisa alleges that the Administrative Law Judge ("ALJ") erred because substantial evidence does not support (1) her evaluation of Lisa's treating physician's opinion, (2) her physical RFC findings, and (3) her assessment of Lisa's subjective allegations of impairment.

**A. Medical History**

1. Physical Impairments[3]

In August 2013, Lisa suffered a left ankle lateral malleolar fracture. R. 777, 789. By October, Lisa had no restrictions. R. 775–76. In January 2014, Dr. Randolph Clements evaluated the same ankle after Lisa complained that it had not gotten any better. R. 907, 913. Her x-rays were completely normal, but an MRI showed an absent anterior talofibular ligament and a diminutive calcaneofibular ligament with irregularity of the deltoid ligament. Id. Dr. Clements referred her to physical therapy and prescribed an ankle brace. R. 914.

Lisa established care with Mark Taylor, M.D., in October 2013. R. 813. The record indicates that Lisa saw Dr. Taylor through at least May 2014.[4] During that time period, Dr. Taylor diagnosed pre-diabetes (R. 816, 834), diabetes mellitus (R. 928, 930, 933), obesity (R. 933), chronic knee pain (R. 816), chronic lower back pain (R. 816), and left ankle pain (R. 834). Dr. Taylor recommended to Lisa that she modify her diet and begin exercising. R. 816, 835. Dr. Taylor also saw Lisa for common maladies, like a rash and sore throat. R. 930, 933.

In March 2015, Lisa went to the emergency room for chest pain. A cardiac catheterization showed no significant obstructive coronary artery disease with mild left anterior

---

[3] I will not discuss any physical impairments for which Lisa does not contest the ALJ's findings, including her vision conditions, heartburn, hypertension, uterine fibroids and other gynecological conditions, sinusitis, allergic rhinitis, skin conditions, and tooth abscesses, among others. I also will not discuss any alleged mental impairment because Lisa does not contest the ALJ's finding that she did not have one.

[4] Dr. Taylor established a new practice in February 2014. R. 926.

5

descending artery stenosis no greater than 20% to 30%, and a normal ejection fracture of 65%. R. 1053. A myocardial scan was positive for reversible changes, and Lisa began medication. Id.

In April 2015, Lisa established care with Raschid Ghoorahoo, F.N.P., whom she saw until February 2016. Ms. Ghoorahoo diagnosed pre-diabetes or diabetes (R. 1008, 1011, 1017), obesity (R. 1011, 1020), joint pain (R. 1009), and nerve pain (R. 1020). Ms. Ghoorahoo recommended that Lisa modify her diet and exercise, and Lisa told her that her all-over body pain decreased as she lost weight. R. 1011, 1019.

In January 2015, Lisa went to the emergency room for right elbow pain, and she was diagnosed with degenerative arthritis. R. 1043, 1046. Lisa went to the emergency room again in April 2016 for left hand pain, where she was diagnosed with acute pain of the left hand and acute Raynaud's phenomenon. R. 1111. No further care was recommended.

Lisa saw another orthopedic provider, James Gills, P.A., in May 2016 for left knee pain. An x-ray showed mild degenerative changes, and Mr. Gills diagnosed left knee osteoarthritis. R. 1100. She received a steroid injection, brace, and a physical therapy referral, and Mr. Gills recommended over-the-counter medications. Id. From August to October 2016, Lisa saw another orthopedic doctor, Brent Johnson, M.D., for left shoulder pain that radiated down her arm and caused numbness and tingling. R. 1178–79. X-rays showed no acute injury. R. 1182. Apart from early degenerative changes in her AC joint, her shoulder was normal. Id. Dr. Johnson diagnosed a left rotator cuff strain, for which he recommended conservative treatment. R. 1183. Lisa refused PT, but agreed to try home exercises and received an injection. R. 1187. After not improving, Lisa received a PT referral. R. 1188. Lisa was evaluated for PT in November 2016, but she was discharged in December 2016 after cancelling three appointments. R. 1239, 1245.

Lisa established care with another primary care provider, Kelsey Hayden, P.A., in April

6

2016. She saw Ms. Hayden through December 2016, during which time Ms. Hayden diagnosed pre-diabetes (R. 1122), obesity (R. 1122), Raynaud's (R. 1122), left knee pain (R. 1139), and arthralgia of an unspecified joint (R. 1147). For the Raynaud's, Ms. Hayden recommended a splint and over-the-counter medications. R. 1123. Ms. Hayden prescribed Neurontin after Lisa complained of pain, numbness, and tingling in both feet. R. 1143. Ms. Hayden recommended that Lisa modify her diet and exercise more. R. 1122, 1148. In December 2016, Lisa complained of knee and ankle pain, and Ms. Hayden diagnosed neuropathy in both feet, chronic pain of the left knee, and chronic pain of the left ankle. R. 1222, 1226. Ms. Hayden increased Lisa's Neurontin dosage and completed paperwork for a handicap parking placard. R. 1226, 1236.

Lisa saw a podiatrist from May 2014 to December 2016 for diabetic foot care. He diagnosed diabetes with peripheral circulatory disorder with neurological complications. R. 1193, 1196, 1199, 1202, 1205, 1207, 1213, 1216, 1218, 1220, 1238, 1268. In February 2017, Lisa saw Adrienne Kinsey, D.O., for all-over pain and pain in her feet, for which the Neurontin was not helping. R. 1253. Dr. Kinsey diagnosed neuropathy and fibromyalgia. R. 1255.

In her February 2014 function report, Lisa described her daily activities as doing dishes, cleaning her house, doing some cooking, making the bed, showering, and sweeping. R. 696. She also takes care of her cat. R. 697. Lisa indicated having no problems with personal care. Id. She is able to prepare sandwiches and frozen dinners for herself daily. R. 698. When going out, she does not go out alone and does not drive, but is able to shop once per week. R. 699. Lisa can count change, handle a savings account, and use a checkbook. Id. Lisa's hobbies include reading, watching television, and going to church. R. 700. Lisa indicated that she uses a cane and brace. R. 702. In her February 2014 pain questionnaire, Lisa wrote that she has pain in her lower and upper back, neck, legs, and feet that lasts all day. R. 711. Moving, getting out of bed, and

housework make the pain worse, but medication makes it better. R. 711–12.

At the hearing, Lisa testified that she last worked as a part-time cashier in December 2015, but quit because of stress, a blockage in her heart, and her aching back and legs. R. 491–92. She had been missing one to two days of work per week at that point. R. 492. Lisa testified that she previously fractured her left ankle and had knee surgery, so she uses a cane. R. 494. Her ankle swells daily, and she has to elevate it once or twice per day. R. 500–01. Lisa testified that her fibromyalgia affects her back, shoulders, and hands, and she has Raynaud's in her hands. R. 496. Her left shoulder also hurts, and she has constant pain from her neck to lower back. R. 503, 505. Lisa testified that she also has constant neuropathy in her feet from her diabetes. R. 501–02. She stated she was still on Neurontin and had started Cymbalta. R. 496. Lisa described being tired all the time, and she has to lie down once or twice per day in addition to elevating her ankle. R. 502. Lisa's daily activities include dishes, laundry, and some house cleaning and light dusting, but chores are difficult because she has a hard time standing. R. 499, 504. When she goes shopping, her husband goes with her, and he does most of the cooking. R. 500. Lisa does not drive, but the DMV issued her a handicap parking placard. R. 505.

2. Medical Opinion Evidence

In May 2014, as part of the state agency's initial disability determination, Jack Hutcheson, M.D., reviewed the record and determined that all of Lisa's medically determinable impairments were non-severe, including dysfunction of major joints, essential hypertension, and diabetes mellitus. R. 525. Accordingly, Dr. Hutcheson did not make an RFC determination, writing that Lisa's condition does not result in significant limitations in her ability to perform basic work activities because her condition is not severe enough to be considered disabling. R. 527. Thus, he found that Lisa was not disabled. Id. Joseph Leizer, Ph.D., completed a

psychiatric evaluation for Lisa's initial disability application, but found that the record failed to establish any medically determinable mental impairment. R. 526.

Lisa failed to show up to her consultative examination appointments on December 8, 2014, and January 9, 2015. R. 1003–04. At the hearing, Lisa could not remember missing the two consultative examination appointments, but her attorney stated that Lisa missed the first appointment because of a family emergency. R. 497–98.

As part of the reconsideration of the state agency's disability determination, Gene Goodwin, M.D., evaluated the records in January 2015. He determined that Lisa's medically determinable impairments of essential hypertension, diabetes mellitus, disorders of the female genital organs, and asthma were severe, and her dysfunction of major joints and gastritis and duodenitis were non-severe. R. 538–39. Dr. Goodwin did not make an RFC determination because Lisa failed to attend her consultative examination. R. 538. Thus, he found her to be not disabled, writing that the evidence still did not show that Lisa's condition was disabling. R. 540. During that same reconsideration, David Deaver, Ph.D., also found that the record failed to establish any medically determinable mental impairment. R. 539.

In July 2014, Lisa's primary care doctor, Mark Taylor, M.D., completed a medical source statement. He estimated that Lisa could lift twenty pounds frequently, stand or walk for four hours in an eight-hour workday, and sit for either six or eight hours in an eight-hour workday. R. 996–97. She would be able to push and pull, and could occasionally climb, balance, kneel, crouch, crawl, and stoop. R. 997. Dr. Taylor indicated that Lisa would have no manipulative or visual/communicative limitations, but indicated that she should limit her exposure to vibration, humidity and wetness, hazards, and fumes, odors, chemicals, and gases. R. 998–99. Dr. Taylor based his opinion on Lisa's ankle pain and poorly-controlled diabetes. R. 997. He also indicated

9

that Lisa would be absent from work about three times per month. R. 999.

### B. Treating Physician's Opinion

Lisa argues that the ALJ erred in her evaluation of Lisa's treating physician's opinion. Dr. Mark Taylor completed a medical source statement in which he offered an opinion regarding Lisa's limitations and absenteeism. R. 996–99. The ALJ gave some weight to Dr. Taylor's lifting and standing restrictions, but gave no weight to his opinion that Lisa would be absent from work three days per month. R. 20. Lisa asserts that the decision to give no weight to Dr. Taylor's opinion regarding her absences is error, specifically because the ALJ relied on an incorrect conclusion about the nature of Dr. Taylor's treatment relationship with Lisa. Pl.'s Br. at 14–15, Dkt. No. 20. On brief, the Commissioner argues that the ALJ appropriately found that the absenteeism portion of Dr. Taylor's opinion was not consistent with his treatment notes or the record as a whole. Def.'s Br. at 13, Dkt. No. 14. At the hearing, the Commissioner argued that while Lisa may have identified an error committed by the ALJ, the error is harmless because the ALJ's decision as a whole is still supported by substantial evidence. Because the reasons that the ALJ provided for assigning no weight to this aspect of Dr. Taylor's opinion are factually inaccurate and thus incorrect, I am inclined to agree with Lisa that substantial evidence does not support the ALJ's assessment of her treating doctor's opinion.

A treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record" will receive controlling weight. 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); see also Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord

10

the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); Brown, 873 F.3d at 256. Further, if the ALJ determines that a treating physician's medical opinion does not deserve controlling weight, she must consider the following factors to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. § 404.1527(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r Soc. Sec. Admin., No. 2:09-cv-622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citing Burch v. Apfel, 9 Fed. Appx. 255, 259 (4th Cir. 2001) (per curiam)).

> In her opinion, the ALJ wrote:
>
> The undersigned has considered the opinion of Dr. Taylor and gives it some weight with respect to the standing and walking limitations. However, his opinion that [Lisa's] impairments would cause her to miss work about three times a month is not consistent with or supported by his treatment notes or the record as a whole and is given no weight. Moreover, Dr. Taylor only saw [Lisa] on three occasions on April 1, 2014, April 15, 2014, and May 20, 2014 (Exhibit 8F), and treated her for sinus pain and pressure, sore throat, a cough, and a rash. Thus, his opinion is given the weight set forth hereinabove.

R. 20. Lisa asserts that the ALJ's conclusion that Dr. Taylor saw Lisa only three times and for only minor conditions is erroneous. The record supports this argument. The ALJ cited Lisa's visits with Dr. Taylor in April and May 2014 after he started a new practice in February 2014. See R. 926. However, Lisa saw Dr. Taylor for the first time in October 2013 and followed him to

11

his new practice. See R. 813.

In citing to only the 2014 visits, the ALJ disregarded Lisa's prior visits that Lisa had with Dr. Taylor. Lisa saw Dr. Taylor on at least three occasions before April 2014, during which he diagnosed conditions that are relevant to Lisa's disability claim. See R. 813, 816 (establishing care and diagnosing pre-diabetes, weight gain, chronic knee pain, and chronic back pain, among others, and prescribing medication for the orthopedic conditions); R. 829–30 (assessing toe injury); R. 833–35 (diagnosing pre-diabetes and left ankle pain and prescribing medication). The ALJ failed to discuss these medical records at any point in her opinion, including during her review of the medical evidence.[5] It is unclear to the Court how the ALJ evaluated Dr. Taylor's medical source statement when she failed to even recognize all of Lisa's visits with him.

Additionally, in her short reference to Dr. Taylor's source statement, the ALJ mischaracterizes the 2014 records. She states that Dr. Taylor treated Lisa for sinus pain and pressure, sore throat, a cough, and a rash. R. 20. However, at the April 1 visit, Dr. Taylor discussed Lisa needing PT for her left ankle, noted that she had seen an orthopedic doctor, recorded her A1C level, and diagnosed uncontrolled diabetes mellitus. R. 928. At the April 15 visit, Lisa went in for a sore throat and cough, but Dr. Taylor again noted a diabetes mellitus diagnosis. R. 930. On May 20, in addition to discussing a rash, Dr. Taylor noted that Lisa's Metformin was stable, her weight and blood glucose level had decreased, and again diagnosed diabetes and obesity. R. 933. Thus, while Dr. Taylor treated Lisa for mild conditions, he also discussed in 2014 her left ankle trouble, diabetes, and obesity. Coupled with the earlier records, Dr. Taylor's treatment records may be more consistent with his opinion than the ALJ concluded because he was aware of and saw Lisa for orthopedic issues and diabetes over time. Dr. Taylor's knowledge of these conditions is particularly relevant because, in his source statement, he wrote

---

[5] The ALJ did discuss Dr. Taylor's medical source statement in her review of the medical evidence. R. 18.

12

that he based his opinion on Lisa's poorly-controlled diabetes and ankle pain. R. 997. Thus, the ALJ's "logical bridge" seems facially inaccurate because she mischaracterized Lisa's visits with Dr. Taylor. See Brown v. Berryhill, Civil Action No. 7:16-cv-00404, 2018 WL 1439602, at *3 (W.D. Va. Mar. 22, 2018) (citing Brown, 873 F.3d at 270).

The ALJ cannot adequately analyze medical opinion evidence if she fails to take into account the full nature of a claimant's relationship with her treating physician, along with the medical records documenting the treatment relationship. The nature and length of the treatment relationship is essential for applying a number of factors that the regulations require the ALJ to consider, including: the examining relationship between the medical source and the claimant; the treatment relationship; the opinion's support by medical evidence; and the consistency of the opinion with the record as a whole. § 404.1527(c)(2)–(5). Specifically in evaluating the treatment relationship, the ALJ should consider the length of the relationship, frequency of examination, and nature and extent of the treatment relationship. The ALJ cannot adequately consider those factors if her underlying assumption—that Dr. Taylor saw Lisa only in April and May 2014 and for conditions wholly unrelated to her disability application—is factually incorrect. Additionally, the ALJ's statement that Dr. Taylor's opinion regarding Lisa's absenteeism is inconsistent with his own treatment notes cannot be correct, either, because there is no indication in her decision that the ALJ considered all of Dr. Taylor's treatment notes.

The ALJ must sufficiently articulate her findings such that the Court can undertake a meaningful review. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013) ("'A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence that ALJ found credible and why, and specific application of the pertinent legal

13

requirements to the record evidence.'")); see also Patterson v. Comm'r of Soc. Sec. Admin., 846 F.3d 656, 663 (4th Cir. 2017) (emphasizing the importance of "[r]eaching a decision in a well-reasoned and documented fashion" and admonishing an ALJ to "[s]how your work"). The ALJ may very well conclude again that Lisa is not disabled, and perhaps the ALJ can explain further how she evaluates Dr. Taylor's medical source statement. However, her failure to do so in this case is reversible error and requires remand.[6]

## CONCLUSION

It is not the province of the Court to make a disability determination. The Court's role is limited to determining whether substantial evidence supports the Commissioner's decision. In this case, the ALJ failed to satisfy her duty of explanation, and meaningful judicial review is impossible. For the foregoing reasons, I **RECOMMEND GRANTING in part** Lisa's Motion for Summary Judgment, **DENYING** the Commissioner's Motion for Summary Judgment, and **REMANDING** this case for additional consideration under sentence four of 42 U.S.C. § 405(g).

The Clerk is directed to transmit the record in this case to Glen E. Conrad, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive on the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion

---

[6] Because I find that remand is warranted based on the ALJ's failure to explain her evaluation of Lisa's treating physician's opinion, I will not address her additional allegations of error. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). I will also not consider the additional evidence that Lisa submitted to the Appeals Council after the ALJ issued her decision because the record that was available to the ALJ provides a sufficient basis on which to review her decision.

reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

      Entered: August 6, 2019

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge

15